GEORGE S. HAZARD and FRANK W. FISKE, Respondents, *v.* JAMES SPEARS, impleaded with JAMES D. McDONALD and EZEKIEL McDONALD, Appellants.

PRINCIPAL AND AGENT. ACTS OF AGENT OUTSIDE OF AN EXPRESS AND LIMITED AUTHORITY. RATIFICATION BY PRINCIPAL. INTENTION. DEFENSE ON APPEAL.

It being conceded, that a principal may ratify the unauthorized acts of his agent, by not objecting to or disavowing them, when known, still, such ratification is not to be assumed from his not making such objection in letters written to his agent under an erroneous understanding of the facts in the case, and of the consequences of the acts done.

But, where, subsequently, in a conversation between the principal and agent, all the facts are disclosed by the latter, and the former makes no objection, fails to repudiate the authority exercised by his agent, or to countermand his directions not yet consummated, there is evidence to support the finding by the jury of a ratification by the principal.

Whether or not it was the *intention* of the parties, at such interview, the one to procure, and the other to concede, a ratification, is immaterial. Intentions, except as manifested by the acts and statements of parties, are of no avail. The principal was concluded by his silence, whatever may have been his *intentions* in the premises.

The principle governing the case is found in *Prince* v. *Clark* (1 Barn. & Cres. 185; 8 Eng. Com. Law, 80), and is as follows: "The principal has no right to wait the fluctuation of the market, in order to ascertain whether the purchase (or sale?) is likely to be beneficial. He is bound, if he dissents, to notify his determination within a reasonable time."

A defense cannot be made available upon the appeal, that was not brought forward upon the trial.

THIS is an action to recover money advanced by the plaintiffs at the request of the defendants. The plaintiffs were the factors and agents of the defendants, at the city of Buffalo. The defendants resided at Attica, in the State of Indiana, and were engaged there in the business of packing and shipping to the eastern markets, for sale, pork and hams. On the 25th day of March, 1861, the defendants shipped and consigned to the plaintiffs, as their factors, a quantity of hams for sale at seven cents and three-fourths of a cent per pound. The plaintiffs received the hams, at Buffalo, on the 2d day of April, 1861, and, on that day, advanced to the

defendants, on the hams, five thousand and twenty-five dollars, and charged it in account.

On the 26th of April, 1861, the plaintiffs made a contract for the sale of the hams, at seven cents and three-fourths of a cent per pound, to Samuel Perry, of the city of New York, through a Mr. A. B. Howe, of Buffalo. The sale was for cash on delivery, and the plaintiffs were to have the possession of the hams until they were paid for. Mr. Howe expected to pay for the hams by drawing drafts for the amount of the purchase-money, on Mr. Perry, in New York, and having them discounted at the Farmers & Mechanics' bank, in Buffalo. The acceptance and payment of the drafts were to be secured to the bank by a shipping bill of the hams. Mr. Perry was, at that time, in good credit, and an extensive dealer. A third of the hams were shipped by railroad at once, a draft discounted, and its proceeds $1,800 were paid to the plaintiffs. The balance of the hams were to be shipped by railroad, that or the next day, and the cashier of the Farmers & Mechanics' bank promised to discount the drafts to be drawn against that shipment. The hams were put aboard of the cars, and the shipping bills were taken by the plaintiffs. The bank failed to discount the drafts; the cashier, however, desired to send the drafts forward, immediately for acceptance, saying that he could advance the money on them in a day or two. He took the drafts, with the shipping bills attached, as security for their payment, and sent them to New York for acceptance.

The cars, in the mean time, left Buffalo with the hams, without the knowledge of the plaintiffs; and Mr. Perry failed two or three days thereafter. The plaintiffs, as soon as the news of Mr. Perry's failure reached Buffalo, went to the depot to retain the hams, but found they were *in transitu* for the city of New York, and had got so far on their way that it was impossible to stop them.

The plaintiffs took the first train for the city of New York. They found Mr. Perry had accepted the drafts, had failed, and was unable to pay for the hams. He gave up the hams on the surrender of his acceptances.

The plaintiffs tried to sell the hams in New York, but could not find a purchaser. The plaintiffs then placed the hams in the charge of Messrs. Purdue & Ward, who were acting as factors for the defendants, to be disposed of to the best advantage.

The plaintiffs, on their return from New York, wrote to the defendants, under the date of the 20th of May, 1861, a full history of the transaction. The defendants received this letter, and in their answer, under date of the 28th of May, 1861, said, "we are sorry you had so much trouble with the hams, but hope that the $1,800 you received will make good all losses, and that you will be paid for your extra trouble. Let us hear from you soon, and hoping that all will be satisfactory, we are" etc. On the 10th of June, 1861, the defendants again wrote: * * * " We think if the money in your hands will make the original sale good, you had better have the hams closed out." The plaintiffs saw the defendant, Mr. Spears, in Buffalo, in June 1861, and gave him a full account of the ham transaction. Mr. Spears made no objection, but expressed himself sorry the transaction had turned out as it had. He imputed no blame to the plaintiffs.

After this, Messrs. Purdue & Ward rendered to the plaintiffs an account of the sale of the hams, and they, on the 27th day of July, inclosed a copy of the account, and also their own account, to the defendants, showing a balance, due the plaintiffs, of $2,525.88. In the letter, containing these accounts, the plaintiffs repeat the history of the affair.

There was a communication daily by mail between Buffalo and Attica, and the ordinary time for the transmission of letters between those places, was from twenty-four to thirty-six hours.

The defendants moved for a nonsuit, and the court denied the motion; holding that the plaintiffs must account to the defendants for the hams, at the price of the first sale, viz., seven cents and three-fourths cents per pound, unless the jury shall find that Spears had, in the conversation testified to by Hazard and others, ratified and adopted the plaintiffs' acts respecting the hams. This ruling was excepted to by

the defendants. Mr. Spears was sworn on his own behalf. He gave a history of the entire transaction as given to him by Mr. Hazard, in June, at Buffalo, which, in its general features, is that given by Mr. Hazard in his evidence. He further says, "I did not feel it was my duty to be frank with him, as it was a business I did not control. I did not feel it my duty to tell him he would be held liable for the sale of the hams." He read the plaintiffs' two letters to Messrs. Purdue & Ward, before this interview, in New York, directing the hams to be sold.

The defendants' counsel renewed the motion for a nonsuit at the close of the evidence. The court made the same ruling as before.

The defendants' counsel then requested the court to direct a verdict for the plaintiffs, for $82.95 only. The court declined to do this.

The court ruled that the plaintiffs would be entitled to recover the amount claimed by them, if the jury found, from the evidence, that the defendant, Spears, in the interview with Mr. Hazard, in June, 1861, at Buffalo, ratified the acts of the plaintiffs. That the defendants, by the letters read in evidence, had not ratified or adopted the plaintiffs' acts; and submitted the evidence of ratification contained in the conversation between Hazard and Spears, and charged that the plaintiffs were entitled to recover $82.95 only, unless they found the ratification referred to. The defendants' counsel insisted that there was not sufficient evidence of ratification to submit to the jury.

The jury found $2,152.67 for the plaintiffs, upon which judgment was rendered. The defendants appealed from this judgment to the General Term of the Superior Court of the city of Buffalo, where the same was affirmed. They now appeal to this court.

*Benjamin H. Williams*, for the appellants.

I. That Spears was ignorant and was not informed by Hazard of the following facts, all of which it was material for him to know:

1. That Howe, in making the purchase, acted simply as the agent of Perry.

2. That Howe was liable to McDonald, Spears & Co., for the price of the pork, which was the fact, even if it be conceded that he was merely Perry's agent. Because the drafts were not only drawn, but were also indorsed by him.

3. That Howe was perfectly solvent. A fact which Hazard, himself, testifies to in substance.

4. That Howe was voluntarily released from his liability as indorser, and that this circumstance was not communicated to Spears, is evident from the fact that Hazard, upon the trial, did not know, or pretended not to know, what Howe's liability was. He supposed the drafts were to the order of Pierson, the cashier.

5. That Purdue & Ward advised against an immediate sale, and that the hams should be held until later in the season.

Hazard did not pretend that he either showed Spears Purdue & Ward's letter, or told Spears that they so advised.

And if it be assumed that the letters of Hazard to Purdue & Ward, written in June, and read in evidence, were seen by Spears (which is not certain, as he testifies that they were not in answer to letters of Purdue & Ward), still it is clear that Spears did not know that Purdue & Ward advised against a sale.

And Hazard meant that he should not know it. Hence he asked his opinion as to the expediency of a sale.

6. That McDonald, Spears & Co. were to be charged with a double commission.

7. That there was no definite understanding with the Farmers & Mechanics' Bank, as to what proportion of the hams it was entitled to. Nor that its proportion was to be "jumped at," or arbitrarily determined by Purdue & Ward.

And the case shows that they did arbitrarily determine the amount.

Argument of Counsel.

ACCOUNT OF SALES.

| | |
|---|---:|
| Net proceeds of their sales were .............. | $2,977 67 |
| One-third of that is.......................... | $999 22 |
| They allowed the bank........................ | 992 56 |
| Difference between that sum and one-third being, | $6 66 |

The drafts were for unequal sums.

And the hams were unequally divided into four car-loads, instead of being equally divided into three car-loads.

Hazard did not know which car-load was represented by the bill of lading attached to the discounted draft.

II. Spears was misinformed by Hazard:

1. Upon the trial Hazard swore that the sale was to Perry.

2. He "meant Perry," in his letter of May 20th.

3. But, in his conversation with Spears, he stated that the sale was to Howe.

"That I had sold them to Howe at 7¾."

"Unacquainted with Mr. Perry, although I had the strongest assurances that he was responsible for any thing he might undertake for Howe or himself."

"Howe took the property on these conditions: that I should not part with any interest until he had paid."

"Howe procured his bills of lading."

"He told Spears he had sold the hams to Howe."

"Took the hams from Perry's possession."

"Hazard stated that he had sold the hams to Howe, and Howe had failed to pay for them."

"Out of Perry's hands."

"To a party who has bought in this market for five years, the man he drew on (S. Perry, New York)."

"Perry, who at once said, he had no claim on the hams; if we would procure his acceptance, he would surrender the property."

There is not the slightest intimation in the case that either McDonald, Spears & Co. were informed by letter, or that Spears was informed by Hazard, in the conversation, that the sale was in fact to Perry, or that Howe, in making the pur-

chase, professed to act for Perry, or that Howe indorsed the paper. The first intimation that Howe, in making the purchase, professed to act for Perry, was made by Hazard upon the trial.

4. Spears understood and was led to believe that the $1,800 was paid on account of the entire purchase, and not for one car load.

"He said he got the $1,800 on the hams."

5. Hazard intended that Spears should suppose, that, at the time of their conversation, Purdue & Ward were without instructions to sell, although they were then under peremptory orders to do so.

"I asked Spears what we should do with the hams, whether we should sell or hold on."

III. Hazard's statements are inconsistent with each other, and with the actual facts. In his letter of May 20th, he says: "They (the hams) were then, as is usual, sent to the railroad cars and loaded for New York."

"We were not disposed to let the hams go, but the cashier said," etc. — "we therefore consented to let the hams go forward."

"We consider the result favorable than otherwise, as it was quite probable when the writer left for New York, that the hams would be entirely out of his reach."

Upon his direct examination he swore: "He (Pierson, the cashier) sent the bills of lading and drafts to New York for acceptance."

"One car load of the hams were then in Perry's cellar. He would surrender them upon my giving up the drafts and paying the expenses; this was the only arrangement I could make with him; was glad to do that."

6. The bills of lading show property and possession out of Hazard & Co.

"He took the hams out of Perry's possession." Richardson.

"Hazard went to New York and got the hams from Perry."

Fiske's statements are to the same effect. In his letter of

August 13, he said: "But in this case the property did not pass out of our possession in fact; we still retained the bills of lading, and of course the possession."

Upon the trial he swore that what he told Spears was: "I would not consent to let the property pass out of my possession," and that "when the bills of lading were made, they were to be held by me until the drafts were negotiated."

"Pierson advised sending these drafts to New York, that they should be with the bills of lading."

The statements to Spears, as testified to by Hazard, are susceptible of no interpretation other than that the sale was to Howe, that Perry was lawfully in possession of the hams as Howe's consignee, and therefore entitled to hold as security for his advances, and the information of Howe's solvency was withheld.

IV. It stands upon the evidence uncontradicted, that,

1. Spears told Hazard that he could not tell him (Hazard) what he had better do with the hams; that McDonald controlled those matters, and that Spears promised to consult him and advise Hazard. This is not inconsistent with Hazard's statement.

2. That Spears said to Hazard: "It is very unfortunate for you, Mr. Hazard, that you let the hams go out of your possession without getting the pay for them."

3. That Spears was ignorant of the whole business. He avowed his ignorance to Hazard, who testified as follows: "He may have said he did not know any thing about the circumstances."

V. The rulings of the court were erroneous.

1. In refusing to strike out Hazard's statement that Spears imputed no blame to him.

2. In excluding the proof offered, as stated at folios 143–4, and in excluding the evidence called for by the question stated at folios 154–5, and the offer of proof at folios 155–6.

3. In admitting evidence of Kerr & Co.'s embarrassments.

VI. The court erred in refusing to charge, that if, in the conversation, Hazard did not entertain the idea of procuring

a ratification, and Spears did not intend to ratify the plaint-
iffs' acts, there was no ratification.

1. If the jury had been so charged, and had found, spe-
cially, that Hazard did not entertain the idea of procuring a
ratification, and that Spears did not intend to ratify, the
general verdict must necessarily have been limited to $82.95.

By such a finding the jury would, in effect, have negatived
the fact of ratification or acquiescence.

2. Hazard made no claim upon Spears.

3. He knew that Spears was ignorant of the whole busi-
ness, and Spears so stated.

4. Neither Spears nor his firm were then enjoying any of
the fruits of Hazard's acts. The $1,800 originally paid by
Howe, had simply gone to their credit upon plaintiffs' books,
and if he had then disavowed the acts of Hazard, in terms, it
would have made no difference in respect of the $1,800, or
in the sale of the hams.

5. The plaintiffs were not prejudiced by the omission of
Spears (if he did omit) to disavow Hazard's acts.

6. It is evident that if Hazard did not entertain the idea
of procuring a ratification or adoption of his acts by Spears,
he was unaffected by Spears' omission to express his dissent.

7. It is clear that the idea of ratification or adoption was
an afterthought, and that in the interview, both Hazard and
Spears talked and acted upon the hypothesis that the plaint-
iffs would ultimately seek to charge the losses consequent
upon the disposition of the hams to the defendants, and that
they would not submit to bear them.

VII. The motion for a nonsuit should have been granted,
for the reasons stated in the case.

VIII. The court erred in charging the jury that if they
should find that Spears, in the conversation with Hazard, in
June, 1861, ratified the plaintiffs' acts in respect to the
hams, that they should find a verdict for the plaintiffs for the
amount claimed by them, to wit, $2,152.62, which included
their charge of $125 commissions and interest thereon, and
that both factors were entitled to a commission.

Under this charge the jury were not allowed to pass upon

the question as to whether Spears, at the time of the alleged ratification, was in possession of all the material facts.

Spears, on the occasion of his interview with Hazard, in June, 1861, might have ratified the acts of the plaintiffs; yet, if he did so in ignorance of any material fact, that ratification would not be binding on the defendants. (*Owings* v. *Hull*, 9 Pet. 607; 32 Penn. 340; *Seymour* v. *Wycoff*, 6 Seld. 224; *Nixon* v. *Palmer*, 4 id. 398; Dunlap's Paley on Agency, 171, note O, 172, note Q; 7 T. R. 209; Story on Agency, 224–243; 7 Hill, 128; *Brass* v. *Worth*, 40 Barb. 654; *Copeland* v. *Mercantile Insurance Co.*, 6 Pick. 202; *Bell* v. *Cunningham*, 3 Pet. 69; *Horsfall* v. *Fauntleroy*, 10 Barn. and Cres. 755; *Thorndyke* v. *Godfrey*, 3 Green, 429.)

IX. The court erred in its decision that, if the jury should find that Spears ratified the acts of the plaintiffs in his interview with Hazard, in June, 1861, the plaintiffs would be entitled to recover the amount claimed by them.

The ratification of an act of an agent previously unauthorized, must, in order to bind the principal, be with a full knowledge of all the material facts. (See *Owings* v. *Hull*, 9 Pet. 607; *Seymour* v. *Wyckoff*, 6 Seld. 213; *Bell* v. *Cunningham*, 3 Pet. 69; *Copeland* v. *Mercantile Insurance Co.*, 36 Pick. 202; *Brass* v. *Worth*, 40 Barb. 654.)

By the above decision the court assumed that, at the time of the alleged ratification, Spears was in possession of all the material facts, and as to that point there was a question of fact which should have been submitted to the jury.

The decision was erroneous, in that the court did not decide that if the jury should find that Spears, with a full knowledge of all the material facts, ratified the acts of the plaintiffs in his interview with Hazard, in June, 1861, the plaintiffs would be entitled to recover the amount claimed by them.

It was in proof, that Spears was not informed of material facts relating to the matter of the sale, and the court should either have held that the ratification was not binding, or, if it deemed any of the proof showing Spears was not fully informed as to the material facts contradicted, then it should have submitted to the jury, as a question of fact, whether

such ratification was made with a knowledge of all the material facts and circumstances.

Had the court submitted to the jury the question as to whether, at the time of Spears' alleged ratification, in June, 1861, he was possessed of all the material facts and circumstances, the jury might, and probably would, have found that he was not informed of such facts, in which case the ratification would not have been binding on the defendants, and the verdict would have been for the sum of only $82.95.

The jury found that Spears, in his conversation with Hazard, in June, 1861, ratified the plaintiffs' acts in respect to the hams; but they did not, and could not under the charge, find that, at the time of such ratification, Spears was informed of all the material facts, for the court in its charge assumed that Spears was so informed — an assumption which, under the testimony, it had no right to make, and which was, clearly, error, for which the judgment should be reversed.

X. The charge was erroneous.

1. For submitting the question of ratification to the jury.

2. For charging that the defendants were liable for the commissions of both factors.

XI. The court erred in refusing to charge as requested.

*John Ganson,* for the respondents.

I. There are only two questions for review here, — first, was there sufficient evidence of a ratification to authorize the submission of the case to the jury? and, second, were the plaintiffs entitled to recover the commissions claimed by them?

II. The evidence tended to show that Mr. Hazard disclosed to Mr. Spears, at the interview had between them in June, 1861, in detail, the entire transaction.

Mr. Spears, before this interview, had read the plaintiffs' two letters to Messrs. Purdue & Ward, of June 5th and 8th. This Mr. Spears admitted in the trial. Messrs. Purdue & Ward informed Mr. Spears that the plaintiffs had placed the hams with them for sale. Mr. Hazard so informed him in the June interview, and he advised their sale.

III. This disclosure was sufficient to comply with the law in such cases. Where the factor, or agent, exceeds his authority, or departs from his instructions, the principal is bound to repudiate his acts at the first opportunity. Any delay on the part of the principal in renouncing the transaction, in such a case, as soon as he can, or any inclination to wait and ascertain how the result may be, is, in law, an acceptance by the principal of the factor's act. (*Prince* v. *Clark*, 1 Barn. & Cres. 185 ; 8 Eng. Com. Law, 80 ; *Cornwal* v. *Wilson*, 1 Ves. Sen. 509.)

In this case the parties resided so near each other that they could have daily communications by mail. The defendants were informed, in a personal interview, by the middle of June, of the transaction in detail. They did not intimate any dissent until the 8th of August, and did not finally communicate their determination to repudiate the plaintiffs' acts until the 5th of September.

The defendants, during all this time, according to their own testimony, kept silent to see whether there would be a loss. But, by the evidence of the plaintiffs, they did not renounce the transaction in June, when they were informed of it, but expressly sanctioned it by advising a resale of the property. In the case of *Prince* v. *Clark* (1 Barn. & Cres. 185), above cited, the principal delayed, from May 29th to August 7th, renouncing the act of his agent. The jury found, from this delay, an acquiescence, although the principal resided in London and the agent was at Calcutta. The court sustained the finding of the jury.

IV. The law not only requires a principal, in case he intends to renounce the acts of his factor or agent, to do so as soon as he is informed of them, but it exacts of him frankness in his dealings with his agent. The relation is a fiduciary one. The agent is required to act in entire good faith, and the law is so jealous and careful of his morals that it will not suffer him even to incur temptation ; he cannot deal with his principal's property on his own account, without the principal's express consent. This being so, it was particularly the duty of the defendants, when they were informed

of the sale to Mr. Howe, to have frankly told the plaintiffs they must account to them for the price agreed to be paid on the sale to Mr. Howe, and deal with the hams thereafter as their own, in case they intended to renounce the transaction. Instead of doing so, Mr. Spears testifies that "he was cautious not to give any instructions about the hams; that he did not feel it to be his duty to be frank, nor to tell the agent he would be held liable for the sale of the hams." Not having so told him then, but having given instructions relative to their sale, he is deemed to have elected to take his chances in the market, on his own account, and must, therefore, abide the consequence. The failure to repudiate the plaintiffs' acts in June, and the long delay thereafter to renounce them, was a clear acquiescence in, and an adoption of, those acts, by the defendants.

V. If the foregoing positions are tenable, then, of course, the allowance of commissions was proper, and the judgment should be affirmed.

HUNT, Ch. J. The sale of the hams in New York, at a lower price than that fixed by the defendants, and obtained by the plaintiffs in Buffalo, gives rise to the present controversy. The plaintiffs were limited in price by the order of the defendants. They were expressly directed not to sell them for less than seven and three-fourths cents per pound. The sale made in Buffalo, was at that price, but the purchaser failed to pay, and the sale was rescinded. The expenses of the property to New York, and the sale there, together with the fall in price, produced the loss for which the amount of the verdict was given.

Immediately upon his return from New York, Mr. Hazard, one of the plaintiffs, wrote to the defendants, giving a full account of the transaction, and informed them that the hams had been left with Purdue & Ward, to dispose of to the best advantage. In the several letters, the defendants acknowledge the receipt of this information, and make no claim that they did not approve of the entire proceeding. The judge, at the trial, decided that these letters did not constitute

a ratification of the transaction. The case does not furnish the ground of this decision. I presume it was from the fact, that it is assumed in each of the letters, that the $1,800 paid was upon the purchase of the entire quantity of hams, and would go to reduce the loss that would arise from the entire sale. In truth, this sum was received in payment of a specific portion of the hams, one car load, and would mitigate the loss upon that portion only, leaving the entire loss upon the remaining portion unprovided for. This would produce a great difference in the general result, and was an important fact in the case. The defendants' ratification, assumed from their failure to object, being based upon an erroneous understanding of the facts, could not bind them. I think the ratification that might be supposed to arise from this view of the case, must be abandoned.

The question then arises, did the conversation in June, 1861, between the defendant Spears and the plaintiff Hazard, furnish evidence, on which the jury are at liberty to find a ratification? By the letters already referred to, the defendants had been informed of the entire transaction, with the erroneous understanding on their part as to the $1,800, already mentioned. They had been distinctly informed that the property was left with Purdue & Ward for sale, and without limit as to price. In the conversation now referred to, all the transaction is again rehearsed to Mr. Spears, the understanding as to the $1,800 is now corrected, and he is informed that the property is left with the New York house for sale, without limit. As testified by Mr. Hazard, he made no objection to the transaction; imputed no blame to the plaintiffs, and expressed his regret at the probable loss. Mr. Spears, himself, testifies that he did not feel it his duty to be frank with the plaintiff, or to tell him that he would be held liable for the sale of the hams.

Under the circumstances stated, the title to the property thus in the hands of Purdue & Ward, was in the defendants. If a change in the market had occurred, by which the price had advanced, the benefit would have accrued to the defendants, and not to the plaintiffs. The sale to Perry was made

by the plaintiffs, as the agents of the defendants, and upon his failure to perform, as such agents, they resumed the possession of the property. They, as such agents, also, left it with Purdue & Ward for sale, without limit as to price. All this was communicated to Spears in person. If he wished to repudiate what had taken place, and to countermand the directions for sale, given in behalf of his firm, and to hold the plaintiffs to the first instructions, it was his duty to have done it promptly. It should have been done on the spot, or certainly within a few days. In fact, there was no renunciation or countermand until the 5th of September thereafter, although a doubt on the subject of their liability to bear the loss was intimated in a letter of the 8th of August.

In *Prince* v. *Clark* (1 Bar. & Cr. 185, 8 Eng. Com. Law, 80), the plaintiff had shipped by the defendant certain goods to the East Indies for sale, with directions to invest the proceeds in specified articles. The defendant invested the amount in Benares sugar, which was not one of the specified articles, and advised the plaintiff of the purchase by a letter, received by him on the 29th of May. The plaintiff made no objection until the 7th of August, when he notified the defendant's agent that he disowned the purchase. The jury held, that by his delay he had assented to the acts of the agent, and the Court of Kings' Bench affirmed their verdict.

BAILEY, J., says: " The principal has no right to pause and wait the fluctuation of the market, in order to ascertain whether the purchase is likely to be beneficial. He is bound, if he dissents, to notify his determination within a reasonable time."

HOLROYD, J., says: "I think the jury might fairly infer from the facts of the case, that the plaintiff did once assent to take the cargo on his own account, or that he meant, at least, to take the chance of the market."

It was objected, in that case, that the defendant had no agent to whom notice could be given, and that he could receive no benefit from the notice. The court held, never-

theless, that an agent might have been found by inquiry, and that the verdict was justified.

The defendants insist that this principle does not affect this case, because, they say, that Howe was liable on the drafts given up to Perry; that he was solvent, and that Spears was not advised of this state of things by Hazard in the June conversation. There are two answers to this objection. It does not appear that Howe was personallly liable on the drafts drawn on the produce shipped. It appears, very distinctly, that he was acting in transaction of the purchase, as the agent of Perry, and thus without interest. Whether the drafts drawn by him upon Perry were drawn as agent, or whether he voluntarily made himself liable upon them, is not proved, and, I think, cannot be assumed. Another, and quite a satisfactory answer is this, that no such point was raised on the trial. If the defendant claimed that the conversation and the delay to repudiate, did not furnish evidence of assent, because Spears was not informed of the fact that Howe was liable on the drafts, and was solvent; he should have called attention, on the trial, to the precise point of which he complained. It was plainly stated that the drafts, whatever they were, were given up to Perry as a means of obtaining the return of the property. This, the defendant Spears certainly knew, and if he had not been informed of the other alleged facts, and had, on the trial, placed himself on that ground, the plaintiffs would then have had the opportunity of showing how the facts were, and what was the statement of them to Spears. To allow it now to be urged, when it was omitted at the proper time, would be quite unjust. The point is of frequent occurrence, and we rule upon it at nearly every term.

In the same manner the defendants object, that Spears was not informed by Hazard that the sale was in fact to Perry and not to Howe. If this fact is of importance, the answer to the objection is the same as that given to the preceding one, that attention was not called to it on the trial.

The defendants also insist that the judge erred in refusing to charge, that, if, in the conversation referred to, Hazard did

not entertain the idea of procuring a ratification, and Spears did not intend to ratify the plaintiffs' acts, there was no ratification. If Hazard's testimony is to be relied upon,—and it was believed by the jury,—he had acted, as he supposed, faithfully and honestly in the discharge of his duty as the defendants' agent, in making the sale, in recapturing the property, and in directing its resale by Purdue & Ward, at the best price that could be obtained. Upon the first opportunity he communicates all the facts orally to Mr. Spears. The question then is, what is the legal effect of all this, with the answers of Spears in connection? If both Hazard and Spears had certainly thought that the transaction was right in itself and could not be disturbed or repudiated, and that no ratification could improve it, and therefore had no intention on the subject, would that have altered the legal effect of what they said and did? Or if Spears was satisfied that he had an advantage of Hazard, and meant to stand upon his strict rights, and at some convenient time to assert them, and yet, upon a full and frank statement of all the facts, made no visible or audible repudiation of the transaction, would he not have been concluded by his silence? The case of *Prince v. Clark* is clear to the point that he would be. The law passes its judgment upon, and gives legal effect to, what is said and done. Intentions except as they are manifested by the acts and statements of the parties are of no avail.

I see no difficulty from the allowance of commissions, nor from the other objections to the rulings on the trial.

Judgment should be affirmed with costs.

CLERKE, J. The only question in this case is whether the defendants ratified the sale ordered by the plaintiffs in New York. After the latter ordered the sale, they communicated with the defendants, giving them a complete history of the transaction, their letter being dated the 20th of May, 1861. The defendants wrote an answer, regretting the trouble that the plaintiffs had in respect to the hams, and expressing a hope, that the $1,800 which they had received from Howe, would make good all their losses, and that they would be

paid for their extra trouble. There was other evidence of acquiescence. All this was properly left to the jury, to determine whether it proved a ratification.

The judgment should be affirmed with costs.

Judgment affirmed.